# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
ex rel. NICOLE OLCOTT,  )
  )
          Plaintiff,  )
  )
v.  )  Case No. 12-CV-605-CVE-FHM
  )
SOUTHWEST HOME HEALTH CARE,  )
INC., KINNSER SOFTWARE, INC., and  )
DR. ROGER LEE KINNEY,  )
  )
          Defendants.  )

## OPINION AND ORDER

Now before the Court is Defendant Kinnser Software, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint and Brief in Support (Dkt. # 68). Defendant Kinnser Software, Inc. (Kinnser) argues that the relator plaintiff, Nicole Olcott, has not alleged all of the essential elements of a claim under the False Claims Act, 31 U.S.C. 3729 et seq. (FCA), and that she has failed to plead fraud with particularity as required under Fed. R. Civ. P. 9(b). Dkt. # 68. Olcott responds that Kinnser engaged in a conspiracy with the other defendants to use its software to submit false claims to Medicare, and she asserts that she has made specific allegations as to Kinnser's role in the conspiracy. Dkt. # 78.

## I.

Southwest Home Health Care, Inc. (Southwest) is a home health agency with offices in Sallisaw and Tulsa, Oklahoma, and Southwest is an approved home health provider by the United States Department of Health and Human Services. Dkt. # 10, at 5-6. The relator plaintiff, Olcott alleges that Southwest provides home health care services to approximately 200 patients in the Tulsa

area. Id. at 7. Roger Lee Kinney, M.D. is the medical director for Southwest. Id. at 6. Olcott alleges that Kinnser is a medical software company that provides software for the electronic submission of claims to the federal government, and she alleges that Kinnser also provides consulting services to home health agencies in Oklahoma and other states. Id. Olcott states that she was employed by Southwest from May 29 to June 24, 2012, and she claims that her employment was terminated after she complained that Southwest was submitting false claims for payment to the United States. Id. at 6.

Olcott alleges that Southwest purchased or leased software from Kinnser approximately 60 days before she was hired by Southwest, and Southwest obtained the software "partially" for the purpose of electronically submitting claims to Medicare. Id. at 7. Kinnser also provided consulting services, and a Kinnser representative, Debra Cupps, was assigned to advise Southwest employees "on the creation of medical bills and records and the submission of claims." Id. Olcott claims that Southwest and Dr. Kinney had a practice of creating false medical records and submitting false claims for reimbursement before it purchased software from Kinnser, and Olcott alleges that Cupps became an active participant in the submission of false claims to Medicare. Id. at 8. Based on Cupps' conduct, Olcott asserts that "Kinnser knew of, participated in, and promoted the submission of false and fraudulent documents to the United States in order to receive unwarranted and improperly enhanced payments through the Medicare program." Id.

According to Olcott, Southwest submitted false claims for payment for medical services that were not provided to patients, and Southwest billed Medicare multiple times for the same medical care. Id. at 9-10. Olcott specifically references several patients that she visited during her employment with Southwest as examples of the alleged fraudulent conduct giving rise to her claims

2

under the FCA. One Dr. Kinney patient, L.S., allegedly had four separate diagnostic codes on her medical records for the same condition. Id. at 10. Olcott alleges that D.F.'s medical records contained diagnoses for high blood pressure and low blood pressure. Id. at 20. Southwest allegedly used three separate codes to describe the nerve and joint problems caused by J.W.'s diabetes. Id. Olcott alleges that using multiple codes for the same medical condition resulted in an overpayment by the United States on claims submitted by Southwest. Id. at 21. Olcott claims that Southwest sent nurses to complete medical intake forms at a patient's home without providing the nurses a "History and Physical" prepared by a physician as required by federal regulations. Id. at 21. She claims that this conduct occurred with the "knowledge and consent" of Kinnser. Id. at 9.

Olcott alleges that Kinnser's actions went beyond simply knowing and consenting to the submission of false or misleading claims to Medicare, and she asserts that Kinnser trained and advised its customers to submit enhanced or fraudulent claims to Medicare. She bases her allegation that Kinnser engaged in a broader scheme to defraud the United States on her experiences while employed with another home health agency, Allied Healthcare (Allied), and she claims that Kinnser counseled Allied to engage in similar fraudulent conduct as Southwest. Id. at 11. Cupps was the Kinnser representative assigned to work with Allied. Id. Olcott states that Cupps' fraudulent practices fell into two general categories:

> A. In some cases the Kinnser software medical records of patients were changed by the Kinnser Representative or at her direction without even consulting with or telling the nurse who had actually examined the patient.
>
> B. In other cases the records were changed and the Kinnser Representative directed the nurses to reopen the files and validate the changes to medical records that were designed to fraudulently enhance claims in order to obtain excessive or unwarranted payments from the United States.

3

Id. Nurses at Allied brought Cupps' conduct to the attention of their employer, and Allied terminated its relationship with Cupps. Id. at 12. Olcott claims that she brought Cupps' conduct to the attention of Southwest, and Southwest terminated Olcott's employment and continued its relationship with Cupps and Kinnser. Id.

The amended complaint alleges that defendants breached the conditions of payment and the conditions of participation under applicable Medicare statutes and regulations. Under 42 U.S.C. § 1395a, a physician may not certify a patient for home health services from an entity in which he has a significant financial interest. Olcott claims that Dr. Kinney is the medical director of Southwest and he acts as the primary care physician for several of the patients with whom Olcott worked while she was employed by Southwest. Id. at 13. She further claims that Dr. Kinney's office maintains an office for his private practice that adjoins the offices of Southwest, and she claims that such leases are closely scrutinized under federal regulations. Id. at 14. Kinnser was allegedly aware of Dr. Kinney's improper financial relationship with Southwest. Id. at 15. Federal regulations require that each home health patient receive a "patient-specific comprehensive assessment," and this assessment must occur within 48 hours of the patient's referral for home health care. 42 C.F.R. § 484.55. This assessment must meet certain minimum requirements, which include a review of the patient's medications and a summary explaining the need for home health care and the desired goals and outcome of the treatment. Id. Olcott claims that the assessments were often missing critical information about the patient's treatment and medication, and Southwest falsely certified to Medicare that the patient had a face-to-face visit with a physician to review the assessment. Dkt. # 10, at 16-17. Home health providers are required to keep an updated plan of care at a patient's home, and Olcott claims that the plan of care was often missing. Id. at 17. The amended complaint

alleges that Dr. Kinney and Southwest were aware of these acts of non-compliance with Medicare statutes and regulations. Id. at 17-18.

Oloctt alleges that Southwest's nurses and nurses aides used "roving charts" prior to Southwest's purchase of software from Kinnser, but these roving charts were not the same medical records maintained in Southwest's office in Sallisaw to generate medical bills. Id. at 18. Olcott claims that it became clear after the adoption of Kinnser's software that the roving charts were incomplete, and the "mismatch between 'roving charts' and the Sallisaw patient records demonstrates a long-standing practice at Southwest of adjusting billing codes, treatment plans and daily medical notes to wrongfully enhance reimbursement by the United States." Id. at 19. According to Olcott, "Kinnser and Southwest" instructed nurses to alter treatment records to show that certain treatment or training had been provided to patients, and the altered medical records were used to bill Medicare for services that had not actually been performed. Id. at 22. Olcott claims that treatment records she created after visiting a patient were "amended or deleted by Southwest and/or Kinnser in a manner that misrepresented the patient's medical condition." Id. at 23. Olcott provides specific examples of patients whose records were allegedly altered, but she does not specifically allege that Kinnser or Cupps had any role in the falsifying of records in reference to any specific patient. Id. at 24-34.

On October 29, 2012, Olcott filed this qui tam action on behalf of the United States alleging claims against Southwest, Kinnser, and Dr. Kinney, and she filed a motion to seal the case pending an investigation by the United States. The case was sealed, and the United States requested additional time to investigate Olcott's allegations. Olcott filed an amended complaint (Dkt. # 10) while the case was sealed. The amended complaint alleges that defendants violated the FCA by

5

submitting false claims for reimbursement (count one) and that defendants conspired to violate the FCA (count two). Olcott also alleges that she was wrongfully discharged by Southwest after she reported her concerns about possible Medicare fraud (count three). The United States elected to intervene only as to Olcott's claims against Southwest arising out of allegedly false claims submitted between October 29, 2010 and October 29, 2012. Dkt. # 42, at 3. The complaint in intervention (Dkt. # 42) leaves intact any of Olcott's remaining allegations against Southwest and Olcott's claims against Dr. Kinney and Kinnser. Id. The case was unsealed on January 29, 2018 and defendants were served in February 2018. Kinnser has filed a motion to dismiss (Dkt. # 68), and the motion is fully briefed.

**II.**

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." Id. (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 562. Although decided within an antitrust context, Twombly "expounded the pleading standard for all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to a claimant.

Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

### III.

Kinnser argues that Olcott has not alleged that Kinnser actually submitted or caused to be submitted a false claim to the United States, and the allegations of the amended complaint do not suggest that Kinnser had any knowledge that Southwest was submitting fraudulent claims. Dkt. # 68, at 11-14. Kinnser further alleges that plaintiff has failed to plead all of the essential elements of a conspiracy claim under the FCA, and she has failed to plead her claims with particularity as required by Fed. R. Civ. P. 9(b). Id. at 15-23. Olcott responds that Kinnser and Southwest engaged in a scheme to submit enhanced or fraudulent claims for services that were never provided to Southwest's patients. Dkt. # 78, at 7. She claims that Kinnser advertised that it could enhance a health care provider's revenue through the use of Kinnser's software, and it accomplished this by "teaching Southwest how to bilk the [United States] Government." Id. at 8.

### A.

Kinnser argues that the amended complaint contains no allegation that Kinnser submitted or caused to be submitted a false claim to Medicare, and that count one of the amended complaint should be dismissed for failure to state a claim. Dkt. # 68, at 11-12; Dkt. # 81, at 5-6. Olcott argues that she has adequately alleged that Kinnser caused a false claim to be presented, because she has

alleged that Kinnser falsified medical records or directed that employees of Southwest falsify medical records. Dkt. # 78, at 16. Southwest allegedly relied on the falsified records when submitting claims to Medicare, and Olcott claims that this caused a false claim to be presented to the United States. Id.

"The FCA 'covers all fraudulent attempts to cause the government to pay out sums of money,'" and the qui tam provision of the FCA allows a private citizen to bring an FCA claim on behalf of the United States government to recover for the payment of fraudulent claims. United States ex rel. Conner v. Salina Regional Health Center, Inc., 543 F.3d 1211 (10th Cir. 2008) (quoting United States ex rel. Boothe v. Sun Healthcare Group, Inc., 496 F.3d 1169, 1172 (10th Cir. 2007)). The FCA provides that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000 per false claim. 31 U.S.C. § 3729(a). "Knowing" and "knowingly" mean that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information . . . ." 31 U.S.C. § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B). A claim can be deemed false under the FCA under theories that the claim is factually or legally false. A person makes a factually false claim by either "(1) submitting an incorrect description of the goods or services provided; or (2) requesting

reimbursement for goods or services never provided." United States v. The Boeing Company, 825 F.3d 1138, 1148 (10th Cir. 2016). Legal falsity can take the form of express or implied false certification. Id.

Kinnser argues that it provided software used by Southwest for the submission of claims to Medicare and it provided training on how to use the software, but there are no allegations that Kinnser ever submitted a claim for payment to the United States government. Dkt. # 68, at 12. The amended complaint contains general allegations that Kinnser software was used to change patients' medical records at the direction of Kinnser's representative, Cupps. Dkt. # 10, at 8, 11. Southwest allegedly began using Kinnser's software about 60 days before plaintiff began her employment with Southwest on May 29, 2012. Id. at 7. However, plaintiff alleges that Dr. Kinney and Southwest had a "long-standing practice . . . of adjusting billing codes, treatment plans and daily medical notes to wrongfully enhance reimbursement by the United States," and Cupps became aware of Southwest's pre-existing practice of submitting fraudulent claims when she arrived to train Southwest's employees. Id. at 7, 19. The amended complaint shifts between allegations that Cupps directed Southwest employees to change medical records and allegations that Kinnser knew of and consented to Dr. Kinney's and Southwest's long-standing practice of submitting fraudulent claims to Medicare. See Id. at 7, 9, 11, 18, 21.

Olcott argues that Kinnser's "own conduct absolutely caused the presentment of false claims to the United States and there is more than a sufficient nexus between Kinnser's conduct and the ultimate presentation of false Medicare claims to the United States." Dkt. # 78, at 16-17. The Court must view the well-pleaded allegations of the amended complaint as true for the purpose of determining whether plaintiff has alleged a plausible claim that Kinnser caused a fraudulent

9

Medicare claim to be submitted to the United States. The amended complaint alleges that Southwest purchased medical software and consulting services from Kinnser, and the software is used to generate medical documentation used to submit claims to Medicare. Dkt. # 10, at 7. Olcott alleges that Cupps was the Kinnser representative providing consulting services to Southwest, and Cupps became aware of Dr. Kinney's and Southwest's pre-existing practice of creating falsified medical records used to obtain reimbursement from Medicare. Id. at 7-8. Cupps allegedly became an active participant in the preparation of falsified medical records and the submission of fraudulent claims. Id. at 8. However, the amended complaint contains no allegations that this conduct was within the scope of Cupps' employment. Olcott generally alleges that medical records were falsified "with the knowledge and consent of Kinnser or at the direction of Kinnser." Id. at 9. However, this general allegation references more specific allegations concerning the records of certain patients, and Kinnser and Cupps are not mentioned as having any direct part in modifying the medical records of any specific patient. Id. at 9-11, 18-34. In reference to one patient, Olcott claims that the medical records for patient B.W. had been amended or deleted by "Southwest and/or Kinnser," but the amended complaint does not identify a specific Kinnser employee who changed the medical records or who directed that such a record be changed. Id. at 23. The amended complaint also does not allege that Kinnser ever submitted a claim for reimbursement, and Olcott does not identify a specific claim for reimbursement that relied on medical records allegedly falsified by a Kinnser employee.

The Court finds that count one of the amended complaint should be dismissed for failure to state a claim upon which relief can be granted. The amended complaint alleges that the Southwest and Dr. Kinney were submitting fraudulent claims to Medicare before they purchased medical software and consulting services from Kinnser, and the practice continued after Kinnser's

representative, Cupps, began consulting Southwest. In other words, Southwest and Dr. Kinney would have been submitting fraudulent claims to Medicare even if Southwest had not purchased Kinnser's software. Olcott alleges that Kinnser's representative participated in the falsification of medical records, but she has not identified any specific patient whose records were allegedly falsified at the direction of Kinnser. There are also no allegations that Cupps was acting at the direction of Kinnser or that Kinnser had any knowledge that Cupps was allegedly aiding Southwest in a scheme to defraud Medicare. Olcott has made general allegations that "Southwest and/or Kinnser" changed patient records that were later used to submit a claim to Medicare, but these allegations are too general to put Kinnser on notice how it allegedly caused a false claim to be submitted to Medicare. Count one of the amended complaint should be dismissed as to Kinnser for failure to state a plausible claim under the FCA.

**B.**

Kinnser argues that plaintiff has not adequately alleged that Kinnser conspired with Southwest or Dr. Kinney to defraud the United States or that Kinnser had actual knowledge any false claims being submitted, and Kinnser asks the Court to dismiss count two of the amended complaint. Dkt. # 68, at 21-23. Olcott responds that Kinnser knowingly marketed its software as a means to submit enhanced or fraudulent claims for reimbursement, and Kinnser acted with deliberate indifference or reckless disregard of Southwest's or Dr. Kinney's use of the software to submit fraudulent claims. Dkt. # 78, at 18. Based on the same argument concerning Kinnser's marketing strategy, Olcott argues that the Court should infer that all of the named defendants agreed to enter scheme to create falsified medical or billing records for the submission of fraudulent claims to Medicare. Id. at 19-20.

The FCA subjects any person to liability who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C). To state a conspiracy claim under the FCA, a plaintiff must alleged that "(1) defendants agreed to get a false or fraudulent claim paid by the United States; and (2) defendants performed an act to effect the object of the conspiracy." Poisson ex rel. United States v. Red River Service Corporation, 2010 WL 11509276, *9 (W.D. Okla. Oct. 5, 2010). The defendants must have a "shared specific intent to defraud" the United States, and negligence is not sufficient to sustain an FCA conspiracy claim. United States ex rel. Farmer v. City of Houston, 523 F.3d 333, 343 (5th Cir. 2008). It is not necessary that a plaintiff allege that the defendants had an express or formal agreement to violate the FCA, and allegations supporting an inference that the defendants had an informal agreement to facilitate the submission of false claims are sufficient at the pleading stage. See United States ex rel. Tran v. Computer Sciences Corp., 53 F. Supp. 3d 105, 134 (D.D.C. 2014). However, the allegations must plausibly suggest that there was an improper agreement or a meeting of the minds to engage in a scheme to violate the FCA. United States ex. rel. Williams v. City of Elk City, 2008 WL 11343000, *9 (W.D. Okla. Oct. 16, 2008).

Kinnser argues that the amended complaint contains no allegations supporting a plausible claim that it entered into any type of agreement with Southwest or Dr. Kinney to violate the FCA. The amended complaint alleges that Southwest purchased medical software from Kinnser, and a Kinnser representative, Cupps, provided consulting services to Southwest. Dkt. # 10, at 7. Cupps became aware that Southwest and Dr. Kinney were creating falsified medical records that were used to submit claims to Medicare, and she allegedly participated in the submission of false claims to Medicare. Id. at 8. Olcott claims that "Cupps and therefore Kinnser" directed employees of

Southwest to falsify medical records, but there are no allegations that Cupps was acting within the scope of her employment or that Kinnser was even aware of that Cupps was allegedly assisting Southwest and Dr. Kinney submit fraudulent claims to Medicare. Olcott alleges that Cupps encouraged another home health provider, Allied, to engage in similar practices. Id. at 12. Olcott claims that she notified Allied of Cupps' conduct and Allied terminated its relationship with the "Kinnser Representative Debra Cupps," not its relationship with Kinnser. Id. The amended complaint contains detailed allegations concerning Dr. Kinney's financial relationship with Southwest, but there are no similar allegations as to Southwest's financial dealings with Kinnser. See Id. at 13-14. The amended complaint alleges that "Kinnser and Southwest" directed nurses to alter or amend treatment records, but there are no allegations this was the result of an agreement to submit enhanced or falsified claims to Medicare. Id. at 22. In fact, there are no allegations that defendants had any intent to enter a conspiracy or that there was a meeting of the minds that Kinnser would aid Southwest in submitting false claims to Medicare.

Olcott argues that she has adequately alleged that Kinnser marketed its software as a means to submit fraudulent or enhanced Medicare claims, and she claims that the Kinnser representative, Cupps, unilaterally altered patient records without consulting the medical provider. Dkt # 78, at 22. She further argues that the defendants agreed to create false medical records to obtain payment for fraudulent Medicare claims, and she alleges that Kinnser had a practice of teaching health care providers to use its software in this manner. Id. at 19. Based on Olcott's response to the motion to dismiss, it appears that she is relying on Kinnser's alleged marketing scheme as the primary fact supporting her conspiracy claim. The problem for Olcott is that there are no allegations in the amended complaint that Kinnser actually marketed its software as a means to submit falsified or

enhanced Medicare claims, and it appears that this is simply an argument created in response to a motion to dismiss to avoid dismissal of Olcott's claims against Kinnser. Olcott has alleged no facts that would support an inference that Kinnser impliedly or expressly agreed with Southwest or Dr. Kinney to defraud the United States and, at best, Olcott has alleged that a Kinnser employee, Cupps, joined an ongoing scheme between Dr. Kinney and Southwest to submit fraudulent Medicare claims. This is not sufficient to show that Kinnser knowingly participated in a scheme to defraud the United States, and the Court finds that count two of the amended complaint should be dismissed as to Kinnser.

## C.

The Court has found that plaintiff's claims against Kinnser should be dismissed for failure to state a claim upon which relief can be granted. Plaintiff requests leave to file a second amended complaint re-alleging her claims against Kinnser in greater detail. Dkt. # 78, at 28. Plaintiff acknowledges that the case was filed in 2012, but she claims that the case was under seal until January 2018. However, plaintiff filed an amended complaint approximately eight months after the case had been filed, and the case was under seal at that time. The fact that the case was under seal did not prevent plaintiff from filing an amended pleading, and it does not explain why plaintiff should now be permitted to file a second amended complaint almost six years after the case was filed. Plaintiff states that she could plead her claims against Kinnser in "greater detail," but she does not describe what additional factual allegations would be included in a second amended complaint or how any additional allegations would cure the deficiencies with her claims against Kinnser. The Court finds that plaintiff's request for leave to file a second amended complaint should be denied.

**IT IS THEREFORE ORDERED** that Defendant Kinnser Software, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint and Brief in Support (Dkt. # 68) is **granted**. Plaintiff's request to file a second amended complaint (Dkt. # 78, at 28) is **denied**. The Court Clerk is directed to terminate Kinnser Software, Inc. as a party.

**DATED** this 24th day of September, 2018.

*/s/ Claire V. Eagan*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE